It is a great pleasure to move the admission of Chris Katopus as a member of this Bar. He is a member in good standing of the Bars of the Highest Courts of New Jersey, Pennsylvania and the District of Columbia. I have personal knowledge of his credentials because he served as my law clerk over this past year. So I am quite satisfied he possesses the necessary qualifications. So I am very pleased to move your admission to the Bar of this Court. And I invite Judge Rader to decide whether to grant that motion. I think we need a vote. Well, I am prepared to vote. I too have known Chris and we share a common background and I am very happy to support his motion. We are looking forward to seeing you for many years, Mr. Katopus. Indeed, welcome to the Bar. If you will proceed to the clerk's area, he will administer the oath. Thank you. Again, welcome to the Bar. The first case this morning is number 06-1578, Navy v. Bath Iron Works. Mr. Manhart. May it please the Court. My name is Kirk Manhart. I represent the Department of the Navy in this case. This Court should reverse the decision of the Board because it was based upon an incorrect interpretation of the Contracts Insurance Clause. The Board should have adhered to the plain meaning of the effective workmanship exclusion as it had previously done in the Jacksonville Shipyards case more than 13 years ago. As the text of the clause explicitly provides, that coverage will not be provided for the inspection, repair, replacement, or renewal of defects themselves in the vessel due to defective workmanship or work that does not conform to the requirements of the contract. Each of the elements of the provision were satisfied by undisputed facts in this case. What was the defect? The defect in this case, the defects were the corrosion holes that appeared in the fuel fill line. And so the Government's view is the Board went astray by, it seemed to me reading the Board, that the Board concluded that the brackish water flush was the defect here. Yes, it found that the brackish water, the use of that water was both defect as well as the defective work. And as we explained, the two cannot be the same, and certainly in this case, but the defect to the vessel were corrosion holes in fuel pipelines which simply can't allow the ship to proceed. And the defective conduct was the deviation from the contract specification which required flushing the fuel main with fuel, as well as it was also inconsistent with an operating procedure of the company. It's not disputed as to what caused the loss, or that this was a casualty loss, or that it flowed from the error that was made in putting the salt water in the pipes. The question is, who's the insurer? And if in fact the Government chose to be self-insurer for a casualty loss, either your point has to be that this is not a casualty loss, or that it's not something that could have been covered by insurance, but for the fact that the Government says, never mind, we'll self-insure. Isn't that the issue? No, we beg to differ. The question of whether it's a casualty loss is essentially irrelevant to the interpretation here. It may well have been a casualty loss because under an all-risk coverage provision, it has to be a casualty to be predicate for coverage. But, as even Bath has conceded, the existence of a casualty has to be read along with the entirety of the clause, and where there is an express exclusion, the specific exclusion also is required to be given its force as a matter of contract. And here there was an express exclusion in the contract for defective work, and defective work which caused damage to the vessel. And here, again, there is not a dispute that there were defects in the vessel, the holes. There is not a dispute that it was caused by defective work, the influx of brackish water at a time when the chlorides in the water were exceedingly high, and that having been left in those pipes for a period of time caused the corrosion. So the elements in the straightforward application of the undisputed facts to the terms of the contract, we have the terms of the exclusion having been met. But we still have, at least the impression that I have, that but for the government saying we'll insure against whatever it is that might require insurance, either you have to say there's no way anybody could ever have insured against this kind of loss, and therefore the government could not have self-insured against it. But there's some gap here. I think the amicus brief stresses that either the government is the insurer and declines to absorb insurance costs as part of the overhead, and as I cite an example, or the contractor takes out whatever insurance would be appropriate to all risk. I don't know what it might be, and be reimbursed it or raise the contract price, and that this is the choice that everybody knew what they were doing when they made. Again, I would beg to differ, Your Honor, and what I'd ask the court to contrast this with is contrast this with an indemnity provision. This is not at all protection for any events that occur. It's an insurance provision. An insurance provision requires the existence of a casualty, but the insurance provision also, the parties can agree and have within it exclusions. There are many exclusions in commercial insurance all the time, and here one express exclusion was for defective work. We said we will not pay for coverage for costs incurred when you damage the vessel through your defective work. And they say they draw the line between the cost to repair the pipes and the cost to repair the damage because of the faulty pipes. Which is a concession that there is force to this exclusion provision, which is what the board found, that the exclusion has force and they excluded the cost of the flushing, of redoing the work. But what the board neglected to consider was that the vessel itself was damaged, and it was damaged by the defective work, which is expressly excluded from the coverage that we would bear. Well, the board found otherwise. Yes, it did, and that's why we're here. It was mistaken in failing to give force to the plain terms of the contract. The court clearly misunderstood it and went down the path of saying, if I find it a fortuity, a casualty, an accident, there must be coverage. And that's simply at odds with the four corners of the agreement. They didn't say an accident, they said a casualty. Yes. They didn't say it has to be accidental. They didn't draw the line between, let's say, a casualty caused by negligence and a casualty that's an act of God. They say that, their argument, that if the only aspects which the government as self-insurer would cover would be acts of God, then they would, in an ordinary course of business, take out insurance for other casualties caused by whatever other risks there are besides acts of God. And that their understanding in the custom and tradition has been that this is how it works, and that's certainly what the board held, isn't it? This is how it works. Yes, it did. And as we explained in our briefs, that's a misunderstanding of the conduct that's happened. Do you contest the board's finding of fortuity? We do not dispute. Well, yes, we do, although we find that it's not necessary for the court to reach that question to resolve the appeal. As the insurance law cases that we saw in our brief demonstrate, a fortuity, if there's no fortuity, you can't even come within the four corners of being considered for coverage. But once you are within those four corners, then it must also be given to the terms of the express exclusion. And here, the parties expressly have an exclusion to this that covers this defective work. Assuming we agree with the government's view, its reading of the contract and the contract provision, and that it covered the corrosion of the pipes here, don't we still have to remand on a determination of causation of whether it was due to, or to what extent the corrosion of the pipes was due to the brackish water flush? It seemed to me there was conflicting testimony, and it may be in part, but isn't a remand required? The court certainly could remand, but we don't think it's required, because in the record that, in submitting its request for record of adjustment here, expressly represented to the Navy that the cause of this was the influx, that the brackish water was a cause here. The board made a finding that there were a convergence of elements of which one was this brackish water. Based on the finding that it was a cause, the court could reach and determine that the express terms of the exclusion are satisfied, because what the terms of this cause say is defects to the vessel due to the defective work. And we find the record that there was a variety of conflicting testimony about how some of the factors, the use of the shipping built on a land-level facility, the configuration of the pipes, some of these other elements, how they may have played into the ending result. But there was no dispute that the water was the cause, and absent the water, you couldn't have corrosion. Corrosion is a process, and it's caused by the injection of water. And here, the specification called for flushing these lines with fuel. Just to make one point, there is a lot of testimony and discussion concerning how these pipes may be exposed to seawater in their normal operation. I just want to point out that there's a description of how water is actually used in the system in several parts of the record. One reference I asked the court to look at is in the appendix, page A200, 315. Seawater doesn't flow through these pipes. They are not ordinarily used for the compensation system. The examples used in the record are a variety of unusual circumstances by which some accident could occur, or when the system is being used in its proper fill line, that there could be droplets of water mixed with the fuel as it flows through. But that's when things are flowing and it's fully in operation. It's not the case that these pipes are sometimes running full of fuel and sometimes being the source by which seawater is routinely used to fill these tanks. That's simply not the case here. I see that in my entire rebuttal time. Yes, we can save the rest of your time for rebuttal. Before Mr. Johnson begins, can you check and make sure the microphones are working, particularly in the balcony? Thank you. My name is Richard Johnson, and I represent the appellee in the Cross Appellant Bath Ironworks. Your Honor, I agree with everything Mr. Manhart has said in his argument, with three exceptions. First of all, the water flush with the river water, which was admittedly contrary to a shipyard instruction, was found by the board not to be the cause of the corrosion. It was found by the board to be one of the causes of the corrosion. And the board listed precisely what those causes were. But it was a significant contributor. I don't think that that was in dispute. The board did not use the word, Your Honor, significant. It used the word that it was a contributing cause, along with many other causes. The board, for example, specifically found that the real culprit here was the fact that the water was left in this low-lying piping system for a period of eight months. The board found that, had that flush been performed with fresh water, the same result could well have occurred. Corrosion from fresh water? Yes. Yes, ma'am. And that was based on expert testimony that the board accepted from the bath expert. It was concurred in... I mean, I guess I don't want to belabor this, but I read the board's opinion differently. I mean, you're right. There was an expert that said this was the least important factor, but the board says there were multiple factors that contributed to it. Yes, ma'am. That's true. Exactly. But I was responding to Judge Newman's question about the fresh water versus the brackish water. I'm trying to understand where the line is to be drawn in terms of self-insurance and the obligations of bath to repair an admitted flaw. I think everyone agreed that by putting the salt water in the pipes, this more likely than not wouldn't have happened. I would disagree with that finding. The board found otherwise. And I believe that the central point, the central difference in what happened here compared with what happened on earlier shifts... But did the great debate in the briefs about who was insuring what turn on deciding what was the cause of the corrosion? In one sense, it does, Your Honor, because if the flush was by river water, it was not the cause of the corrosion. In the words of the Navy clause, our due to, which in my reading of it means the cause. It was a multiplicity of causes. Then under universally accepted commercial insurance law, all risks insurance law, then the exclusion does not apply. What about if it was the but for? I mean, the government suggested that there might have been multiple contributing factors, but but for the brackish water flush, it would not have happened. That would fall within the due to language of the insurance clause, correct? Well, Your Honor, but it is not factually correct. Because Bath had previously, and we're not terribly proud of this, but now it's just a scientific fact. Bath had flushed two prior DDGs, one with river water and one with actual 100% ocean water, and nothing happened. And there was one difference. The difference is that the water was not left in the piping system, in a closed system, over a period of several months. And the scientific evidence that was produced at the hearing and that the board accepted said that it was that brackish water lying in that system over a period of eight months. And it was a mixture, by the way, of brackish water and fresh water, because the hydrostatic test water was down in there as well. That was the only difference between what had happened in prior ships and what happened on this ship. Well, let me go back to the insurance clause itself, leaving aside the... Yes, Your Honor. Do you agree that the reference to the government doesn't assume the risk for any defects in themselves in the vessels, that the defect is the corrosion of the pipes? No. What is the defect? Our reading of the clause is different. We believe the clause has at least two meanings, maybe more than two meanings, and I focus specifically on the word defects. It says defects in the vessel. Now, the corroded piping was a defect in the vessel. That is true. If the corroded piping had... it's fuel piping. If fuel had been in that system, if fuel had escaped and ignited and the ship had been destroyed, that would also be a defect in the vessel, because a vessel that has been destroyed is defective. Right. So, by reading the clause the way the Navy does, it means that there is no coverage whatsoever under this all-risk insurance policy for anything that can be linked even remotely to work... Well, that raises all kinds of other questions. I mean, that hypothetical or another similar hypothetical might then bring in what you all think is the fortuitous exception. I mean, if the pipes leak oil and the ship explodes, maybe or maybe not, that's not the case before us. There would be a fortuitous exception. It seems to me that's maybe what fortuitous means. But for a moment, let's just stick to the clause then and say, so you conceded that the defect here is the corrosion in the pipe, right? The corrosion of the piping is a defect in the vessel. There's no question about that. The issue is what does the clause mean when it says that the Navy will not pay the cost for repair, replacement, or renewal of any defects themselves in the vessel? And it's our reading of the clause, and it was the board's reading of the clause, and it is the universal reading of similar clauses in all similar builder's risk cases, that what that does is excludes from recovery the cost of performing the work, again, that did not meet the workmanship standard. If it's a bad weld, you go in, you cut out the weld, and you re-weld it. That is what is excluded by the clause. If the bad weld leads to something, like the ship leaking or something happening, that is covered by the clause. And that has been the reading, I think, as the Amicus brief points out here, the reading of every naval shipyard in the United States for the last 25 years since this exclusion was put in place. It seems to me maybe that discussion goes to the earlier phrase, which says what costs the government will pay for. But if we stick to the phrase, any defects themselves in the vessels, which you've agreed, the corrosion of the pipes, due to defective workmanship, we agree that the flushing with the brackish water was defective workmanship, right? Yes, it was. So why aren't the defects in the pipe due to the brackish water covered by this clause? It seems to me that's exactly what the clause refers to. It's because to do that, we are led down the path, necessarily, and I don't think there's any stopping place along the road, saying anything that happens to that vessel, even if the entire $500 million vessel is destroyed in the process, is not covered by this clause. And that would be an absurd reading of the clause. It would mean that an all risks insurance clause, in fact, covers no risks except acts of God, and I am quite sure that we could link some kind of workmanship, even to acts of God, that impact the ship, such as lightning or storms or hurricanes and things like that. So would you remind me what was measured by the damages that was awarded? The measure of damages, Judge Newman, was the cost of tearing out and replacing the low-lying piping system that had these leaks in it. Some of them could be welded, re-welded, and made sound, but there was a great deal of work that had to be done in the very bottom of the ship, basically take out hundreds and hundreds of feet of this piping and replace it with new piping. That is the cost at issue. That was the casualty. Can you give us an example, then, of what would be covered by this clause? Yes. In my reading of the Navy clause, if we perform any act of workmanship on the vessel or near the vessel that is improper or non-compliant, we have to do it, and at our cost. And it's not covered by the clause. You have to cure any defects. Yes, exactly correct. Exactly correct. So if you do something that's not consistent with the specifications of the contract, and it causes a defect in the vessel, like the corrosion of the pipes, then you agree that the contract says the government is not liable. Exactly correct. It would be bad painting, or we put a ventilation system in the wrong place, or as I said, we do a bad weld. These things happen in shipyards. They happen all the time. They are endemic to shipyards. And what distinguishes putting in a bad weld from running water there that was not allowed by the contract? It is an act of workmanship that did not comply. The use of the river water was an act of workmanship that did not comply. There is no issue about that. And that we would describe as defective workmanship, correct? Defective workmanship. But it led to a casualty, something that no one could foresee. No one had a clue this could happen. We'd flushed two prior DDGs this way without any adverse result. There were other factors at play, the principal one being this was the first ship that we had constructed in an entirely new way. And by doing that and saving the Navy a great deal of money in the process, we created a situation in which we performed certain work earlier in the construction sequence, and one of those items of work was this flush with water, and that water stayed in the piping. You cannot get it out. You can get some of it out, and we got some of it out, but you can't get all of it out. And it was that over time. So you're saying that we ought to apply this clause and draw a distinction between the defective workmanship that the contractor knew about and defective workmanship that he didn't know about? No, ma'am. I think that if it's defective workmanship, you have to correct the workmanship. A welder may not know that he's doing a bad weld. He may do his welding in perfect good faith. So the corrosion here, the flushing with brackish water was defective workmanship under this contract? Yes, it was. There's no question about it. And it was one of the contributing causes to the casualty that occurred. And there's been no finding as to whether or not it was, is it your view that there's been no finding as to whether or not it was a but-for cause or a necessary cause? There was no finding, and under Builder's Risk Insurance Law, if there is a multitude of causes or more than one cause, and one of those causes is a prohibited event, such as the workmanship, the clause, the exception does not apply, and the insurance does apply, and the government, which is sitting here as an insurance company and not as the sovereign of the United States, is subject to that law. Your Honor, I have two minutes and thirty seconds left, and I've reserved one for rebuttal. Well, assuming you get into your cross-appeal. Otherwise, you can use your time as you see fit. I wanted briefly to mention the cross-appeal because it deals with the interest provision of the Contract Disputes Act, and it's our position that the issue before the court is purely a legal issue. It's purely a legal issue, and it can be resolved by the court here and now, and we'll avoid another round at the board and then another appeal up here. And the issue is this. Does contract disputes interest apply in whole? But that's been remanded. We don't even have a decision to review, do we? Well, I think we do. Either that or the board refused to decline to decide an issue of law. And when the board declines to decide an issue of law, Your Honor, it's properly before this court. But it's a very... your position that you should receive interest on money which, according to the record, had been paid in the progress payments is very strange to me. Well, we received progress payments for a period of time, and they were partial progress payments, and they're no longer in existence. They've been repaid, and the progress payments were not dollar for dollar the cost of the casualty. The cost of the casualty were included in the line item for ship construction by agreement with the Navy. It's a written agreement. It's in the file. So what was it the board wanted you and the Navy to work out, dollar by dollar, the accounting? Exactly. And what happened to that? Well, because the government took its appeal here, we brought the cross appeal. And it's our position that by the board's remand, it did one of two things. It either decided that we're only entitled to interest in part under the CDA, or it didn't decide the issue. If you look at the actual remand that the board made to the parties, they didn't remand quantum. They appeared to remand the whole issue, and that's something where it's a legal issue. The board can't do that. Your Honor, I've eaten up all my time including the rebuttal. You have. I think we're all right. If it looks as if you need a last word, we'll squeeze it in. All right. Thank you, Your Honor. Okay. Thank you, Mr. Johnson. Mr. Manhart. Thank you, Your Honor. First on the issue of our appeal, to address the court's self-insurance point, I wanted to just make clear that what the clause says is we won't pay premiums for Bath to provide insurance for its effective work, and we won't pay as a claim things that its effective work costs. Bath is free to go buy insurance. There's no law against that. They have to absorb that cost. We're not going to include that, any coverage, whether through premium or through affirmative coverage of a claim for their effective work, because we pay for inspection. We pay for quality assurance matters. It's a full penalty of the contract issues. Can I ask you about another question? The contract, so the clause says due to. Do you agree that there needs to be a but-for finding in terms of getting the damages? I mean, you suggested the but-for. We agree there needs to be a determinate. Yes, there has to be a finding that it was a cause. It was due to. A but-for cause. A but-for or even as a matter of proximate cause as a predominant cause, and we think that. And there's been no finding of that yet by the board, correct? The board found it was a cause, and we think the record supports finding it was a determinate predominant cause under this court's case law, but yes. I mean, we wouldn't dispute that, and that was an alternative we asserted in our brief. I mean, I think from the discussion today, it's clear that Bath had used this defective method for the flushing on previous occasions, and here we have a situation where due to other aspects of the construction, that defective work caused greater damage. So, I mean, that's what distinguishes this circumstance, not those other elements, but simply the defective work caused damage to the vessel that hadn't previously occurred because of other circumstances, but those other circumstances weren't the cause of the corrosion. The corrosion was the introduction of the water. Now, if because of the corrosion there was oil that leaked and the ship blew up, would you agree that that would be a fortuitous loss not covered? Yes. The Navy insurance expert testified that there is a – the due to prompt like proximate cause has a foreseeability element. So there is, as in many cases, that natural consequence condition by which this would be controlled. One of the examples in terms of prior experience I asked the court to look at is in the appendix. It's on that page A-200-733-35. There was an incident on a different ship with Bath involving a fuel leak, and there Bath first made the claim and then withdrew that claim. And that claim was for costs not simply to repair the fuel leak, but to clean the affected area, replace the insulation that was affected, to replace the defective portions of the ship, not simply patch the fuel line. And we think this is, as was the case in the Jacksonville shipyard case, which where the terms of some of the risk of the clause were a little bit different, but the defective work in the ship exclusion was precisely verbatim the same as the one in this case. The board found that cleaning, steam cleaning of a certain, on the material on the ship involved there, damaged a piece of equipment, and it was the equipment that had to be repaired, not simply reimburse the costs of the additional cleaning. Just in terms of the time... And this is really what's been troubling me all along. It's not really a question of who did what or who's at fault. The question is who's carrying the insurance for what happened, whatever happened, whatever caused it to happen. That's the question, isn't it? Yes, and our appeal rests on our assertion that the plain terms of the exclusion, not simply the clause taken as a whole, its permanent parts, what its scope of risk is, as defined by what is excluded from its coverage, exclude these costs. So the Amici say, and of course we have the board's findings which are very clear, that if in fact the contractors, the shipbuilders, have to now carry insurance that they had till now thought the government was providing, someone's going to pay for it, those costs one way or another. I would think it would make no sense otherwise, that that aspect they complained about overhead. One of the cases where the government paid for a lot of insurance and nothing went wrong, but nonetheless the government had paid a heavy premium and this is being saved. And so the lines that we're drawing in terms of who is at fault is really requiring drawing a finer line than is immediately apparent, other than the word themselves in the contract, as to who's to pay the insurance in the future. Whoever ends up paying it now I suppose will control who pays it in the future. Yes, and we believe that exclusion has been clear, it's been used for more than 20 years, and that 13 years ago in Jacksonville shipyards this clause, this exclusion, was interpreted to establish for contractors if there were any doubt about its plain terms, that the terms are unambiguous, and that that is a cost that rests with the contractor. Okay. It is. We'll take the cross-appeal under advisement, I think. It's okay. Thank you. Thank you, Mr. Manhart and Mr. Johnson. The case is taken under submission. No, he didn't, and that's why I didn't invite you to rebut on the cross-appeal. Thank you, Your Honor. I want to make only one point about the Jacksonville case. No, your time is run.